NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| SCHERING CORPORATION, et al.,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>MYLAN PHARMACEUTICALS, INC., et al.,<br><br>　　　　　Defendants. | Civil Action No.: 09-6383 (JLL)<br><br>**OPINION** |

**LINARES**, District Judge.

　　This matter comes before the Court by way of Defendant Mylan Pharmaceuticals, Inc.'s ("Mylan's") appeal of the June 9, 2011 Letter Order of then-Magistrate Judge Salas granting in part and denying in part Mylan's application to compel discovery based on various alleged waivers of privilege by Plaintiffs, Schering Corporation and MSP Singapore Company LLC (collectively, "Schering"). The Court has considered the submissions of the parties in support of and in opposition to the instant appeal and decides the matter without oral argument pursuant to Rule 78 of the Federal Rules of Civil Procedure. For the reasons set forth below, the ruling of the Magistrate Judge is affirmed.

**I.　　BACKGROUND**

　　In September 1993, Schering filed a patent application that led to the issuance of United States Patent No. 5,757,115 ("the '115 patent") on June 16, 1998. On June 15, 2000, Schering filed for reissue of the '115 patent, and on May 28, 2002, the patent was reissued as United States

Patent No. RE37,721 ("the '721 patent").[1]  While the privilege issues before Judge Salas concerned various events surrounding the prosecution of these patents and Schering's assertion of rights thereunder, the instant appeal focuses only on alleged instances of waiver relevant to (A) an investigation conducted by Schering in 2005 regarding the inventorship of the '721 patent, and (B) circumstances surrounding the June 2000 reissue application that led to the issuance of the '721 patent.

A.     **Inventorship Investigation**

Mylan alleges that a former employee of Schering, the late Dr. Adriano Afonso, "intentionally withheld his name as an inventor of the '721 patent in order to promote the career of his protégé, Dr. Rosenblum, who was a named inventor." (Mylan's Br. in Supp. of its Appeal from Magistrate's Order Regarding Schering's Waiver of Privilege ["Mylan's Br."] at 2.)  On July 15, 2005, Dr. Afonso sent a letter to Schering's then-chief patent counsel, James Nelson, seeking to have his named included as an inventor on the '721 patent.  (Id.)  Mr. Nelson enlisted outside counsel, Dorothy Auth, to investigate Dr. Afonso's claims.  (Id.)  On November 14, 2005, Ms. Auth provided Schering with a written opinion on the issue of Dr. Afonso's inventorship, and on December 1, 2005, Ms. Auth also provided a four-page summary of her findings in a letter to Dr. Afonso.  (Id. at 2–3; see Decl. of Deepro R. Mukerjee ["Mukerjee Decl."], Ex. 9.)

During discovery in the matter of Schering Corporation v. Glenmark Pharmaceuticals Inc., Civil Action No. 07-1334 (the "Glenmark litigation"), Schering produced Ms. Auth's

---

[1]The '721 patent has since reissued as United States Patent No. RE42,461 ("the '461 patent"), and Schering has amended its Complaint to assert claims under '461 patent, rather than the '721 patent.  These events do not affect the underlying legal issues here.

December 1 letter, as well as a letter from Mr. Nelson to Dr. Afonso similarly referencing Ms. Auth's analysis. (Id. at 3.) Schering has also produced those documents in this case. (Id.) During the Glenmark litigation, Schering also permitted defense counsel to depose Ms. Auth regarding her inventorship investigation. (Id.) Schering further allowed defense counsel to depose Anita Magatti, Schering's in-house counsel who prosecuted the '115 and '721 patents, regarding her own investigation into the inventorship of the relevant patents. (Id.)

**B.     Reissue Application**

In June 2000, Schering applied for reissue of the '115 patent, seeking to include "bullet claims" directed toward a specific chemical compound, ezetimibe. Mylan asserts that Ms. Magatti "deliberately excluded the bullet claims from the '115 patent and that Schering's representation to the [United States Patent and Trademark Office (USPTO)] that the omission was inadvertent was false." (Id. at 4.) During the Glenmark litigation, Schering allowed Ms. Magatti, as well as Ms. Auth and Mr. Nelson, to testify regarding Schering's failure to include the bullet claims. (Id.)

**C.     Judge Salas's Ruling**

On October 18, 2010, Mylan filed a letter with the Court arguing that Schering's disclosures during the Glenmark litigation constituted waivers of privilege and seeking to compel the production of related documents. (Id. at 6.) On January 13, 2011, after the parties had submitted initial briefings, Judge Salas held a hearing on the matter and permitted the parties to file additional materials in support of their respective positions. (Id. at 6–7.) On April 14, 2011, Judge Salas held a second hearing, and on June 9, 2011, she issued a Letter Order granting in part and denying in part Mylan's application to compel. (Docket Entry No. 207.) On June 15, 2011,

a corresponding Oral Opinion was issued. (Docket Entry No. 208.) Therein Judge Salas (1) found that the law of the Federal Circuit controlled the privilege issues in dispute, and (2) applied that law to find various instances of waiver and ordered Schering to produce related documents and communications. Thereafter, Mylan sought clarification of Judge Salas's ruling, and the parties were permitted to submit their concerns, in writing, to the Court. The parties were likewise granted an extension of the deadline to appeal. (Docket Entry No. 224.) On July 6, 2011, Judge Salas held an on-the-record telephonic conference addressing Mylan's clarification requests, (see Docket Entry No. 246), and on July 12, 2011, Mylan filed the instant appeal.

## II.     LEGAL STANDARD

Under 28 U.S.C. § 636(b)(1)(A), a United States Magistrate Judge may hear and determine any non-dispositive pretrial matter pending before the Court. The district court will only reverse a magistrate judge's decision on these matters if it is "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); L. Civ. R. 72.1(c)(1)(A). Under this standard, a finding is clearly erroneous when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Anderson v. Bessemer City, 470 U.S. 564, 573 (1985) (citing United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948)). The district court will not reverse the magistrate judge's determination, even in circumstances where the court might have decided the matter differently. Bowen v. Parking Auth. of City of Camden, No. 00-5765, 2002 WL 1754493, at *3 (D.N.J. July 30, 2002). A ruling is "contrary to law" when the magistrate judge has misinterpreted or misapplied the applicable law. See, e.g., Pharm. Sales & Consulting Corp. v. J.W.S. Delavau Co., Inc., 106 F. Supp. 2d 761, 764 (D.N.J. 2000).

In matters where the magistrate judge is authorized to exercise his or her discretion, the decision will be reversed only for an abuse of discretion. See, e.g., Kresefky v. Panasonic Commc'ns & Sys. Co., 169 F.R.D. 54, 64 (D.N.J. 1996) ("Where, as here, the magistrate has ruled on a non-dispositive matter such as a discovery motion, his or her ruling is entitled to great deference and is reversible only for abuse of discretion."). "This deferential standard is 'especially appropriate where the Magistrate Judge has managed this case from the outset and developed a thorough knowledge of the proceedings.' " Lithuanian Commerce Corp., Ltd. v. Sara Lee Hosiery, 177 F.R.D. 205, 214 (D.N.J. 1997) (quoting Pub. Interest Research Group v. Hercules, Inc., 830 F. Supp. 1525, 1547 (D.N.J. 1993), aff'd on other grounds and rev'd on other grounds, 50 F.3d 1239 (3d Cir. 1995)). However, a magistrate judge's legal conclusions on a non-dispositive motion will be reviewed de novo. See Haines v. Liggett Group, Inc., 975 F.2d 81, 91 (3d Cir. 1992); Lo Bosco v. Kure Eng'g Ltd., 891 F. Supp. 1035, 1037 (D.N.J. 1995).

## III.   DISCUSSION

Neither party challenges Judge Salas's ruling that Federal Circuit law controls the instant dispute. Instead, Mylan argues that Judge Salas erred in her application of the controlling law to eleven alleged waivers of privilege by Ms. Auth, Mr. Nelson, and Mr. Magatti. Mylan contends that Judge Salas erred in two fundamental ways. First, Mylan argues that Judge Salas misapplied the law of the Federal Circuit in determining the scope of the subject matter waived by Schering's disclosures. Second, Mylan argues that Judge Salas erroneously characterized certain disclosures as implicating work product immunity, but not attorney-client privilege. The Court addresses these arguments in turn.

### A. Scope of Attorney-Client Privilege Waiver

Under Rule 26 of the Federal Rules of Civil Procedure, a party may obtain discovery of any matter that is "not privileged" and "is relevant to the claim or defense of any party." Fed. R. Civ. P. 26(b)(1). Included in the meaning of "privileged" is the attorney-client privilege, which "protects the confidentiality of communications between attorney and client made for the purpose of obtaining legal advice." In re EchoStar Communications Corp., 448 F.3d 1294, 1300 (Fed. Cir. 2006) (quoting Genentech, Inc. v. U.S. Intern. Trade Com'n, 122 F.3d 1409, 1415 (Fed. Cir. 1997). "Generally disclosure of confidential communications or attorney work product to a third party, such as an adversary in litigation, constitutes a waiver of privilege as to those items." Genentech, 122 F.3d at 1415. But, a party may not use a waiver of privilege as both a sword and a shield, as "selective waiver of the privilege may lead to the inequitable result that the waiving party could waive its privilege for favorable advice while asserting its privilege on unfavorable advice." Echostar, 448 F.3d at 1301. To prevent such abuses, the Federal Circuit "recognize[s] that when a party defends its actions by disclosing an attorney-client communication, it waives the attorney-client privilege as to all such communications regarding the same subject matter." Id. However, "[t]here is no bright line test for determining what constitutes the subject matter of a waiver, rather courts weigh the circumstances of the disclosure, the nature of the legal advice sought and the prejudice to the parties of permitting or prohibiting further disclosures." In re Seagate Technology, LLC, 497 F.3d 1360, 1372 (Fed. Cir. 2007) (quoting Fort James Corp. v. Solo Cup Co., 412 F.3d 1340, 1349–50 (Fed. Cir. 2005). With these principles in mind, the Court turns to Mylan's arguments regarding scope of waiver, first with respect to the inventorship investigation, and then with respect to the reissue application.

1. <u>Inventorship Investigation</u>

Mylan argues that two instances of waiver by Ms. Auth and one instance of waiver by Ms. Magatti warrant a broader scope of subject matter waiver than was ordered by Judge Salas. The June 9 Oral Opinion refers to these waivers as "Auth Waiver 3," "Auth Waiver 5," and "Magatti Waiver 1," a notation which the parties have adopted and the Court follows here.[2] Auth Waiver 3 refers to deposition testimony given by Ms. Auth in the <u>Glenmark</u> litigation describing her interviews with Dr. Rosenblum and his interpretation of "NMR spectra," scientific data relevant to the claimed invention. (<u>See</u> Mukerjee Decl., Ex. 4 at 131:22–132:24, 134:20–136:15.) Auth Waiver 5 refers to Ms. Auth's November 14, 2005, letter to Dr. Afonso describing her findings regarding his inventorship claims, specifically Dr. Rosenblum's work preparing compounds "4E" and "4F," chemicals which became part of the subject matter of the '115 patent. (<u>Id.</u>, Ex. 9.) Magatti Waiver 1 refers to deposition testimony given by Ms. Magatti in the <u>Glenmark</u> litigation regarding her communications with the inventors, their statements as to which chemical groups to include in the patent application, and her reliance on those communications with respect to the novelty of the invention.[3] (<u>Id.</u>, Ex. 5 at 253:20–254:11.)

Before determining the scopes of these waivers, Judge Salas first examined whether Schering was attempting to use selective waivers from the <u>Glenmark</u> litigation as both a sword and a shield against Mylan's improper inventorship claims in this case. Noting that Schering had

---

[2]It is important to note, however, that these waivers refer only to those listed in the "improper inventorship" section of Judge Salas's Oral Opinion. Within the "improper reissue" section are other "Auth Waivers," "Magatti Waivers," and "Nelson Waivers" bearing the same numbers, but referring to different disclosures.

[3]The Court cites only the portions of Magatti Waiver 1 that are relevant here.

already represented to the Court that it will not rely on Ms. Auth's investigation in defending against any claims of improper inventorship here, Judge Salas found that Mylan had failed to carry its burden of producing evidence that Schering was using privileged information as both a sword and a shield. (Docket Entry No. 208, Tr. of Oral Op. Before the Hon. Esther Salas United States Magistrate Judge ["Oral Op."] 11:3–23.) Having so ruled, Judge Salas then turned to the specific disclosures at issue. For each disclosure, she determined which particular privileges were implicated and then ruled as to the scope of any waiver by Schering. With respect to Auth Waiver 3, Judge Salas concluded that the attorney-client privilege was implicated and found waiver as to "all documents and communications between Ms. Auth and Schering related to Dr. Rosenblum's interpretation of the [NMR] spectra." (Oral Op. 14:11–21.) With respect to Auth Waiver 5, Judge Salas concluded that both attorney-client privilege and work product immunity were implicated but found waiver with respect to attorney-client privilege only, requiring the production of "all documents and communications relating to Dr. Rosenblum's work preparing 4E and 4F." (Id. at 15:4–24.) With respect to Magatti Waiver 1, Judge Salas concluded that Ms. Magatti's testimony as to her communications with the inventors about which chemical groups to include in the application—and her reliance on those communications in drafting the application—implicated attorney-client privilege, requiring the production of "all documents and communications between Ms. Magatti and the inventors relating to the decision about what chemical groups to include in the application," as well as "all documents and communications between Ms. Magatti and the inventors relating to whether the processes invented by Dr. Afonso were novel." (Id. at 17:23–18:19.)

      Mylan argues that the scopes of these waivers were drawn too narrowly. Mylan stresses

that waiver of attorney-client privilege destroys privilege as to all other communications relating to the same subject matter, citing Echostar, and therefore argues that the entirety of Ms. Auth's and Ms. Magatti's respective inventorship investigations must be produced. Mylan thus contends that Judge Salas improperly applied a "partial" waiver of privilege standard, when Federal Circuit law mandates "complete" subject matter waiver. (Mylan's Br. at 10.) The Federal Circuit, however, has clearly stated that "[t]here is no bright line test for determining what constitutes the subject matter of a waiver" and that courts must "weigh the circumstances of the disclosure, the nature of the legal advice sought and the prejudice to the parties of permitting or prohibiting further disclosures." Fort James, 412 F.3d at 1349–50. A court is thus given the discretion to determine the scope of waiver based on the particular circumstances under which it was made and in light of the effect that such waiver might have on the litigation at hand. However, Mylan's brief in support of its appeal does not even argue that Judge Salas abused her discretion in determining the scopes of the waivers at issue here. Mylan simply states the reasons why it disagrees with Judge Salas's exercise of that discretion. Discretionary rulings, however, will not be reversed based on mere disagreement. See United States v. Green, 617 F.3d 233, 239 (3d Cir. 2010) ("An abuse of discretion occurs only where the district court's decision is arbitrary, fanciful, or clearly unreasonable—in short, where no reasonable person would adopt the district court's view.") (quotation omitted).

In any event, this Court finds that Judge Salas did not abuse her discretion in determining the subject matter waived by Auth Waivers 3 and 5 and Magatti Waiver 1 here. Serving as a magistrate judge both in this case and in Glenmark, Judge Salas was intimately familiar with the claims at issue and the circumstances under which the subject disclosures were made. In

performing her analysis, Judge Salas first determined that Schering had not used the disclosures to gain a strategic advantage, a finding which Mylan does not dispute on appeal. Judge Salas then examined the content of the particular disclosures and ordered production of documents and communications relating to the factual matters disclosed—matters which appear explicitly in the record and clearly concern the same subject as the disclosures. Her analysis thus "weigh[ed] the circumstances of the disclosure," "examined the nature of the legal advice sought," and considered "the prejudice to the parties." Judge Salas's decision not to broaden the subject matter of these waivers to the "complete subject matter" envisioned by Mylan was therefore not an abuse of discretion.

2.   Reissue Application

With respect to Schering's disclosures regarding the reissue application, Mylan contends that three waivers by Ms. Auth warrant a broader production of relevant materials than was ordered by Judge Salas. These waivers, "Auth Waivers" 1, 2, and 3 relate to the reissue application only and are different from the "Auth Waivers" discussed in the inventorship context. Auth Waiver 1 refers to Ms. Auth's testimony regarding her investigation into Ms. Magatti's failure to include bullet claims in the '115 patent. (See Mukerjee Decl., Ex. 4 at 34:2–61:23.) Auth Waivers 2 and 3 refer to Ms. Auth's testimony regarding her investigation into Ms. Magatti's failure to include the bullet claims, the decision to seek reissue of the '115 patent, and her communications with Ms. Magatti and Mr. Nelson regarding those matters. (Id. at 71:5–85:24.)

Before determining the scopes of these waivers, Judge Salas first examined whether Schering was attempting to use selective waivers from the Glenmark litigation as both a sword

and a shield with respect to Mylan's improper reissue claims. This time, Judge Salas found that Schering was indeed using the testimonies of Ms. Auth and Ms. Magatti as both a sword and a shield, stating that Schering has placed both Ms. Magatti's state of mind and Schering's reliance on Ms. Auth's investigation in issue. (See Oral Op. 20:17–22:21.) Judge Salas then went on to conclude that Auth Waiver 1 implicated both attorney-client privilege and work product immunity, requiring production of "all documents and communications relating to Ms. Magatti's failure to include bullet claims directed to Ezetimibe in the '115 patent," as well as "factual and non-opinion work product relating to Ms. Auth's investigation into Ms. Magatti's error." (Id. at 23:1–13.) With respect to Auth Waiver 2, Judge Salas concluded that only attorney-client privilege was implicated, ordering production of "all documents and communications relating to Ms. Magatti's failure to include bullet claims directed to Ezetimibe in the '115 patent and [the] decision to seek the reissue application leading to the '721 patent." (Id. at 23:14–23.) With respect to Auth Waiver 3, Judge Salas concluded that both attorney-client privilege and work product immunity were implicated, requiring production of "all documents and communications relating to Ms. Magatti's failure to include bullet claims directed to Ezetimibe in the '115 patent and [the] decision to seek the reissue application leading to the '721 patent," as well as "factual and non-opinion work product relating to Ms. Auth's investigation into Ms. Magatti's alleged failure to include bullet claims." (Id. at 23:24–24:14.)

As with the disclosures related to the inventorship investigation, Mylan contends that Judge Salas construed the scopes of these waivers too narrowly. Specifically, Mylan argues that Judge Salas should have found waiver as to the entirety of "Ms. Auth's investigation into the propriety of Schering filing its reissue application." (Mylan's Br. at 16.) Again, this Court finds

that Judge Salas's determination of the scope of the subject matter waived was not an abuse of discretion.[4]  First, Judge Salas found that Schering had used the disclosures as both a sword and shield in this context and thus ordered the production of relevant documents.  (See Oral Op. 22:10–21.)  Then, based on her intimate familiarity with the case and the particular disclosures at issue, Judge Salas considered the contents of Auth Waivers 1, 2, and 3 and ordered, in sum, the production of all documents and communications relating to Ms. Magatti's failure to include bullet claims in the '115 and the subsequent decision to seek reissue of that patent.  In making this ruling, Judge Salas thus considered both the particular disclosures at issue and the conduct of Schering in using those disclosures as both a sword and a shield.  This Court has reviewed the same record and concludes that her decision not to define the scope of waiver as encompassing the arguably broader subject matter of "Ms. Auth's investigation into the propriety of Schering filing its reissue application" was not an abuse of discretion.

### B.      Characterization as Work Product and/or Attorney-Client Privilege

"The attorney-client privilege and the work-product doctrine, though related, are two distinct concepts and waiver of one does not necessarily waive the other." Echostar, 448 F.3d at 1300.  Unlike the attorney-client privilege, which protects all communication whether written or oral, work product immunity protects only documents and tangible things prepared in anticipation of litigation or for trial, such as memoranda, letters, and e-mails. Id. at 1301; see Fed. R. Civ. P. 26(b)(3).  Such materials may be non-privileged.  Furthermore, work product waiver is not a broad waiver of all work product related to the same subject matter, as with attorney-client privilege. Id. at 1302.  "Instead, work-product waiver only extends to 'factual' or

---

[4]Here, Mylan's brief again fails to argue that Judge Salas abused her discretion.

'non-opinion' work product concerning the same subject matter as the disclosed work product." Id. (citing In re Martin Marietta Corp., 856 F.2d 619, 626 (4th Cir. 1988)). The waiver does not extend to opinion work that has never been shared with the client. Id. at 1303.

1. Inventorship Investigation

Mylan contends that Judge Salas erred in finding that, in the inventorship context, Auth Waivers 1 and 2, Nelson Waiver 1, and portions of Magatti Waiver 1 do not implicate attorney-client privilege. Mylan argues that each of these characterizations is clearly erroneous or contrary to law.[5] The Court addresses these arguments in turn.

a. Auth Waivers 1 and 2

In the inventorship context, "Auth Waiver 1" refers to Ms. Auth's testimony as to her conclusion regarding Dr. Afonso's inventorship claims and "one reason why she came to that conclusion." (Oral Op. 13:14–15; see Mukerjee Decl., Ex. 4 at 96:14–97:11.) Auth Waiver 2 refers to Ms. Auth's testimony regarding her conclusion that Dr. Afonso should not have been named inventor on the '115 and '721 patents. (Id.) With respect to these disclosures, Judge Salas concluded that only work product immunity was implicated, but found no waiver. (Oral Op. 13:12–14:10, 16:14–17:2.) On appeal, Mylan concedes that "Schering may have hired Ms. Auth in anticipation of litigation," (Mylan's Br. at 19 n.12), but argues that Ms. Auth's testimony also waived attorney-client privilege, (id. at 19–20). Mylan thus does not appear to dispute that Auth Waivers 1 and 2 implicate work product immunity, but Mylan instead contends that

---

[5]Mylan also argues that, as a general matter, Judge Salas improperly treated the protections of attorney-client privilege and work product immunity as mutually exclusive. (Mylan's Br. at 17.) This argument is entirely without merit. In multiple instances, Judge Salas found waiver of both attorney-client privilege and work product immunity. (See, e.g., Oral Op. at 23:5–6, 24:3–4 (ruling as to Auth Waivers 1 and 3, in the reissue application context).)

because Ms. Auth testified as to her conclusions from a legal analysis performed for her client, her testimony implicates the attorney-client privilege as well. However, this Court has found no evidence in the record that Ms. Auth's testimony disclosed any confidential fact communicated by her client for the purpose of obtaining legal advice. As Judge Salas noted, "Ms. Auth only testified about her conclusion" that Dr. Afonso was not inventor. (Oral Op. 13:21–22.). In so testifying, Ms. Auth even stated that she did not recall the reason why she reached that conclusion. (Mukerjee Decl., Ex. 4 at 97:8–11.) Thus, while Ms. Auth may have disclosed, in some general sense, "the substance of the legal opinion" that she drafted at her client's request, (see Mylan's Br. at 20), Judge Salas did not clearly err in finding that Ms. Auth' testimony did not reveal the substance of any facts communicated to her in confidence by that client. As such, Judge Salas's ruling that Auth Waivers 1 and 2 implicated only work product immunity was not clearly erroneous or contrary to law.

b.  Nelson Waiver 1

In the inventorship context, "Nelson Waiver 1" refers to Mr. Nelson's December 1, 2005 letter to Dr. Afonso concerning Ms. Auth's investigation and her conclusion. (See id., Ex. 10.) With respect to this disclosure, Judge Salas ruled that only work product immunity was implicated, but found no waiver. (Oral Op. 16:14–17:2.) On appeal, Mylan contends that Judge Salas erred in failing to find that the disclosure implicated, and waived, attorney-client privilege.[6] Mylan bases this argument on the contents of Mr. Nelson's letter to Dr. Afonso, contending that the letter disclosed "material elements" of Ms. Auth's inventorship investigation that were

---

[6] As noted above, Mylan does not appear to dispute that the documents produced regarding Ms. Auth's inventorship investigation implicate work product immunity.

protected under the attorney-client privilege. (Mylan's Br. at 21.) A review of the letter itself, however, reveals no apparent disclosure of confidential communications between attorney and client. Rather, like Ms. Auth's testimony in Auth Waivers 1 and 2, Mr. Nelson's letter focuses on Ms. Auth's ultimate conclusion, not her communications with her client. While Mr. Nelson's letter does reference facts contained in the laboratory notebooks of the named inventors, (see Mukerjee Decl., Ex. 10 ("the notebooks of the named inventors evidenced that they had made the compounds you mention prior to and without aid of your solvolysis method")), Mylan has put forth no evidence to suggest that the inventors' notebooks somehow constitute communications from a client to an attorney seeking legal advice. The Court thus concludes that Judge Salas's ruling that Nelson Waiver 1 implicated only work product immunity was not clearly erroneous or contrary to law.

c.   Magatti Waiver 1

The portion of "Magatti Waiver 1" relevant here is Ms. Magatti's testimony regarding the reasons why she concluded that a Dr. Vaccaro was not an inventor and the reasons why she concluded that Dr. Rosenblum was an inventor. (See id., Ex. 5 at 266:8–269:25.) With respect to these disclosures, Judge Salas found that only work product immunity was implicated and ordered production of "factual or non-opinion work product related to Ms. Magatti's conclusion that Dr. Vaccaro was not an inventor" and "factual or non-opinion work product related to Ms. Magatti's conclusion that Dr. Rosenblum was a named inventor." (Id. at 18:13–19:8.) On appeal, Mylan argues that Judge Salas not only erred in concluding that Ms. Magatti's testimony implicated work product immunity, but that Judge Salas also erred in finding that such testimony did not implicate attorney-client privilege. Mylan thus argues, puzzlingly, that Schering should

not be required to produce documents as a result of work product waiver—documents which Schering indicates that it has already produced—but rather that Schering should produce documents pursuant to its alleged waiver of attorney-client privilege.

As Schering correctly points out, however, this argument is a reversal from the position that Mylan took in its original application to compel, wherein Mylan alleged that "Schering has waived attorney client privilege and work product as to documents and information relating to Ms. Magatti's inventorship determination . . . including her failure to name Dr. Afonso or Dr. Vaccaro as a co-inventor." (Br. in Supp. of Mylan's Mot. to Compel Produc. of Documents upon which Privilege was Waived ["Mylan's App. to Compel Br."], Ex. A at 17.) Mylan's appeal with respect to work product immunity is thus both moot in light of Schering's recent document production and barred by the doctrine of judicial estoppel.[7] See New Hampshire v. Maine, 532 U.S. 742, 750–51 (2001) ("[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.") (quoting Davis v. Wakelee, 156 U.S. 680, 689 (1895)); In re Armstrong World Industries, Inc., 432 F.3d 507, 517–18 (3d Cir. 2005). Mylan does not dispute that it has changed position on this issue, and because Schering has indicated that is has already produced the relevant documents, Mylan would gain an unfair advantage if Judge Salas's ruling were reversed. See New Hampshire, 532 U.S. at 751 (stating

---

[7]Mylan's argument also appears to be barred by the related doctrine of "invited error." See Cordis Corp. v. Medtronic Ave, Inc., 511 F.3d 1157, 1172 (Fed. Cir. 2008) (stating that a change of position on appeal "is not reviewable at all, or at most is subject to review under the 'plain error' standard.").

that a court should consider, <u>inter</u> <u>alia</u>, whether a party's later position is "clearly inconsistent" with its earlier position and whether the party "would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."). The Court therefore will not consider Mylan's argument regarding the applicability of work product immunity to Magatti Waiver 1.[8]

The Court instead turns to Mylan's arguments regarding attorney-client privilege. Mylan argues that because Ms. Magatti testified in detail about why she concluded that Dr. Rosenblum was properly named as an inventor on the '721 patent, her testimony waived attorney-client privilege as to all of Ms. Magatti's inventorship investigation. Reviewing the relevant portions of Ms. Magatti's deposition transcript, however, the Court finds no evidence she revealed any communications between her and Dr. Rosenblum or Dr. Vaccaro that were made in confidence and sought legal advice. Indeed, Mylan does not dispute Schering's contention that Ms. Magatti's testimony reflected only facts contained in Dr. Rosenblum's laboratory notebook—a form of communication which this Court has already found to have been unprivileged in this context. Judge Salas's conclusions were therefore not clearly erroneous or contrary to law.

2. Reissue Application

Here, Mylan contends that Judge Salas erred in finding that Nelson Waivers 1 and 2 did not implicate attorney-client privilege. In the reissue application context, "Nelson Waiver 1" refers to Mr. Nelson's testimony as to his discovery that the '115 patent was missing a bullet claim, his decision to hire outside counsel (i.e., Ms. Auth) to investigate the issue, and the results

---

[8]The Court nonetheless notes that while work performed by an attorney to prepare and prosecute a patent application generally does not fall within the parameters of the work product doctrine, related documents may be entitled to work product immunity if they were prepared "because of actual or anticipated litigation." <u>See</u> <u>In re Gabapentin Patent Litigation</u>, 214 F.R.D. 178, 184–85 (D.N.J. 2003) (quoting <u>In re Minebea Corp.</u>, 143 F.R.D. 494, 499 (S.D.N.Y. 1992)).

of the investigation. (See Mukerjee Decl., Ex. 6 at 78:2–81:20.) "Nelson Waiver 2" refers to Mr. Nelson's testimony regarding Ms. Auth's investigation of the bullet claims and the preparation of Mr. Nelson's declaration to the USPTO regarding the matter. (Id. at 90:7–93:24.) With respect to both waivers, Judge Salas concluded that only work product immunity was implicated, ordering disclosure of "factual and non-opinion work product related to Mr. Nelson's investigation and review of the '115 patent and outside counsel's investigation." (Oral Op. 24:17–25:8.)

As with the portions of Magatti Waiver 1 discussed above, Mylan argues that Judge Salas not only erred in concluding that Ms. Nelson's testimony implicated work product immunity, but that Judge Salas also erred in failing to rule that such testimony also implicated attorney-client privilege. But, just as it did with respect to Magatti Waiver 1, Mylan has changed its position on the applicability of work product immunity to Nelson Waivers 1 and 2. In its application to compel, Mylan maintained that in Nelson Waiver 1 "Schering waived attorney-client and work-product privilege" and that with respect to Nelson Waiver 2 the basis of waiver "is the same as set forth above in Nelson Waiver 1." (Mylan's App. to Compel Br., Ex. A at 35, 37.) On appeal, however, Mylan now argues that Nelson Waivers 1 and 2 do not implicate work product immunity. Thus, for the reasons already given, Mylan is estopped from disputing Judge Salas's ruling as to the applicability of work product immunity to Nelson Waivers 1 and 2.

As to Mylan's arguments regarding attorney-client privilege, the Court need only note that Judge Salas explicitly ruled based on her sword/shield analysis that "Schering has waived the attorney-client and work product privileges with regard to Ms. Magatti's failure to include the bullet claims, Ms. Auth's investigation into the propriet[y] of the reissue application and

Schering's decision to seek the reissue" and ordered that "[a]ll relevant documents must be produced." (Oral Op. 22:12–21.) Mylan does not appeal this ruling. Mylan's argument that Mr. Nelson "waived attorney-client privilege with respect to the complete subject matter of the decision to file the reissue application, the propriety of the filing, and the related investigations"— none of which Mylan alleges to extend beyond the subject matter of the materials already ordered to be produced—is thus moot.[9]

## IV. CONCLUSION

For the foregoing reasons, Judge Salas's June 9 Letter Order is affirmed. An appropriate Order accompanies this Opinion.

DATED: August 18, 2011

/s/ Jose L. Linares
JOSE L. LINARES
UNITED STATES DISTRICT JUDGE

---

[9]To the extent that Mylan might dispute the scope of the subject matter ordered to be disclosed, this Court finds based on the evidence in the record that Judge Salas's ruling was not an abuse of discretion. The subject matter underlying Mr. Nelson's disclosures clearly concerns Ms. Auth's investigation into the propriety of the reissue application, and Judge Salas appropriately considered the other factors relevant to the waiver analysis.